360 So.2d 884 (1978)
Howard GRUENBERG and Mrs. Lorraine Gruenberg Goldenberg et al.
v.
GOLDMINE PLANTATION, INC., et al.
No. 8826.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 1978.
Concurring Opinion May 12, 1978.
*885 Milling, Benson, Woodward, Hillyer & Pierson, Charles A. Snyder, W. Richard House, Jr., New Orleans, for plaintiffs-appellants and for intervenors-appellants.
Goldman & Levin, Stanley H. Levin, New Orleans, for defendants-appellees.
Before LEMMON, STOULIG and GARSAUD, JJ.
STOULIG, Judge.
Appellants,[1] the minority shareholders controlling an aggregate 40% of the outstanding 360 shares of Goldmine Plantation, Inc. (Goldmine), have appealed a judgment dismissing their suit to dissolve the corporation under R.S. 12:143(A)(2) or (3) or (7), alleging in essence the majority shareholders have mismanaged the corporate assets to their detriment. The controlling shareholders, members of a voting trust, are S. J. Rodrigue, Ada Rodrigue, Marie Cognevich and Michael Tassin.
Goldmine's principal asset is a 900-acre [2] tract of land fronting on the right descending bank of the Mississippi River in St. John the Baptist Parish. Acquired in 1941 for $65,000, the property was appraised at $3,000 per acre in 1975, giving it a value then of $2,700,000. Since its acquisition the land has been planted in sugar cane and the mineral rights have been leased.
Between 1966 and the present, various industrial interests have expressed a desire to buy this land, the latest proposed price being $3,600 per acre net to vendor. While none of the attempts to purchase have taken the form of a written and binding offer, the evidence suggests that the prospective buyers were substantial and a contract to sell could have materialized had the Goldmine board of directors expressed any interest.
Without investigating the merit of these offers, the directors voted to reject them. It is evident from their testimony they lacked the information to intelligently weigh the proposals in the light of the best interest of the shareholders because they are holding the land for speculation. The minutes of the corporation reflect board member Ada Rodrigue, a certified public accountant, voted against the $3,600-per-acre net offer received in 1973 because the land might be worth $7,000 or $10,000 per acre.
A subsequent appraisal by Omer Kuebel, plaintiffs' witness, the only real estate expert to testify, fixed the value of the property at $3,000 per acre, which is $4,000 per acre less than the minimum price suggested by Ada Rodrigue. The highest price for industrial property realized in this area was $4,837 per acre for land to which Kuebel assigned a higher value. It is apparent Ms. Rodrigue's vote was based on uninformed speculation. From the testimony of the other controlling directors, it is evident they too did nothing further than make a few offhand inquiries with respect to neighboring land values, but they were vague in recalling the specifics of their efforts in this direction.
Meanwhile, back at the farm, the sugar cane crop was yielding dismal dividends which, over the past 10 years, averaged a net profit of less than one-half of 1% and the only reason the operation did not result in a loss for most of these years was that no charge for the use of the land was included in the operating expenses.
The only shareholder who realized anything substantial from the operation in relation to the value of his investment was S. J. Rodrigue, owner of one share, who was employed as farm manager for $12,000 per year plus 20% of the profits in excess of $25,000 on all operations except mineral *886 leases. In 1975, sugar prices skyrocketed and growers, including Goldmine, reaped a substantial profit increase, which also dramatically improved Rodrigue's salary. In 1973, he drew $12,000 in salary and bonus, while in 1975 he was paid $162,128. For the same years the shareholders were paid total dividends of $5,400 ($15 per share) and $72,000 ($200 per share). These were the returns from assets with a fair market value in excess of $2,700,000.
From the minority standpoint, approximately $1,080,000 of their collective funds are tied up in a farming operation that has no future and from which they realize sparse returns. Aware of the tax consequences of liquidating, they nonetheless reason that 50% plus of something they can use is better than 100% of a paper asset beyond their reach.
In the light of this situation, we consider whether plaintiffs and intervenors have sustained the proof to support their demands for involuntary dissolution under R.S. 12:143(A)(2) or (3) or (7), which we quote:
"A. The court may entertain a proceeding for involuntary dissolution under its supervision when it is made to appear that:
* * * * * *
(2) The objects of the corporation have wholly failed, or are entirely abandoned, or their accomplishment is impracticable; or
(3) It is beneficial to the interests of the shareholders that the corporation should be liquidated and dissolved; or
* * * * * *
(7) The corporation has been guilty of gross and persistent ultra vires acts * * *."
First we hold the evidence does not support our concluding the objects of incorporation have "wholly failed" or "been abandoned" or that "their accomplishment is impracticable." Sugar cane has been grown continuously on this property since 1941; therefore the first two enumerated causes for dissolution in subsection (2) are inapplicable. Although the future of sugar cane farming on plantations the size of Goldmine is at best speculative and the record leaves no doubt that the highest and best use of this land at present is for industrial purposes, we cannot conclude that the accomplishment of sugar farming is impracticable.
Low profits per se do not render the accomplishments of the objects of the corporation impracticable. In 1973 it is doubtful that any Goldmine shareholder would have anticipated the yield the corporation derived from sugar farming in 1975. To us "impracticability" connotes an element of obsolescence as well as a low return operation. Therefore relief is not available under (A)(2).
We next consider whether the record supports the view that dissolution would be more beneficial to the shareholders. It can be urged validly in this case that the low returns of the past have been more than offset by the appreciation of the corporate assets. With the completion of the river bridge at Luling within the next few years, the land value, according to Kuebel, should increase tremendously. Thus the proof required by (A)(3) is lacking.
Finally, we consider the contention that the majority shareholders and the board have been guilty of gross and persistent ultra vires acts. While we question the wisdom of the board's approach in reaching a decision not to sell the real estate, we conclude the action taken is within the scope of the board's authority and therefore legal. In 58 Fletcher Cyclopedia Corporations 5821, this language appears that we think applies to the situation before us. We quote:
"Unless it clearly appears that the act is an abuse of discretion, intra vires, legal and good faith acts of the board of directors, other corporate officers, or the majority stockholders, i.e., acts pertaining to the internal management, of the corporation, where they are not fraudulent or unfair to minority stockholders, will not be interfered with or remedied at the instance of minority stockholders, regardless of whether such acts are wise or expedient. In other words, to warrant the interposition of a court in favor of *887 the minority shareholders in a corporation, as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company and in a manner inconsistent with its interests. This is the unavoidable result of the fundamental principle that the majority can regulate and control the lawful exercise of the powers conferred upon a corporation by its charter. * * * The wisdom of the action taken or threatened will not be considered. It is only when the corporate acts are so unjust as to be evidence of fraud and intentional wrong that the internal management will be interfered with. Courts cannot compel corporate officers to act wisely but they can compel them to act honestly."
We appreciate the frustrations of the minority who are locked into a financial situation in which they have a substantial interest but no control. Appellants suggest the shareholders be equated to partners and be permitted to disengage from the corporation as they could were Goldmine operated as a partnership. Our substantive law provides for involuntary dissolution but offers no remedy for the minority shareholder with substantial holdings who is out of control and trapped in a closed corporation. We will not arrogate the legislative function to provide relief.
For the reasons assigned, the judgment appealed from is affirmed.
AFFIRMED.
LEMMON, J., concurs and assigns reasons.
LEMMON, Judge, concurs and assigns reasons.
Because the land has substantial river frontage, its value for industrial use in recent years has increased dramatically, so that no reasonable purchaser would buy the land today for the purpose of growing sugar cane. However, the ever increasing trend in market values for riverfront acreage bears heavily on the critical question in this case: When is it in the best interest of the shareholders to liquidate the corporation and sell the land, now or later?
The overall testimony of the directors is that they were not trying to promote the sale of the property, but were willing to and did consider any and every offer. Consistent with this position they gave no listings and made no counteroffers, so as to avoid fixing a ceiling in the face of constantly increasing values. Yet they never told any prospective purchaser they were not interested in selling, and the thrust of the record is that the sale of the property is only a matter of time.
One cannot say the evidence preponderates that it is more beneficial to the interest of the shareholders to dissolve the corporation and sell the land at the present time rather than in the future, in view of ever increasing values and a further surge expected upon completion of the new bridge.
NOTES
[1] Plaintiffs are Howard Gruenberg, Mrs. Lorraine Gruenberg Goldenberg, Mrs. Joel Grossman Myers and Rene Grossman, who collectively own 20% of the stock. Intervenors, who adopt plaintiffs' position and evidence, are Louis Frederic, Vernon Frederic, Kermit X. Frederic, Madeline Frederic Futrelle, Evelyn Frederic England and Gerard Frederic.
[2] The acreage is variously described as 893 or 917. We use 900 acres for convenience.